IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FOOD TEAM INTERNATIONAL, LTD,        )
                                      )        Civil Action
                Plaintiff            )        No. 10-cv-03584
                                      )
        vs.                          )
                                      )
UNILINK, LLC,                        )
GARY GREGORY,                        )
MARC BEHAEGEL, and                   )
AKBAR BOUTARABI,                     )
                                      )
                Defendants           )

                        *       *       *

APPEARANCES:

            JOHN C. CREES, ESQUIRE
            MICHAEL J. KEATON, ESQUIRE
                On behalf of Plaintiff

            MARK C.H. MANDELL, ESQUIRE
                On behalf of Defendants

                        *       *       *

# A D J U D I C A T I O N

JAMES KNOLL GARDNER
United States District Judge

        The undersigned presided over a non-jury trial on the

Complaint of plaintiff Food Team International ("Food Team")

against defendants Unilink, LLC ("Unilink"), Gary Gregory, Marc

Behaegel, and Akbar Boutarabi, as well as the counterclaim

asserted by defendant Unilink against plaintiff Food Team.  At

the close of the trial, I took the matter under advisement.

Hence this Adjudication.

## SUMMARY OF DECISION

This action arises from a business dispute between plaintiff Food Team (a supplier of frozen produce) and defendant Unilink (a purchaser of wholesale quantities of frozen produce who, in turn, package and sell frozen produce to retail merchants).

Based upon the findings of fact and conclusions of law discussed below, I entered a verdict dated September 30, 2013, which accompanies this Adjudication.

In the Verdict, I find in favor of plaintiff Food Team International, LTD and against only defendant Unilink, LLC[1] on plaintiff's non-PACA claims for failure to pay concerning invoices 1008, 1015, and 4111, and enter judgment in favor of plaintiff Food Team and against defendant Unilink in the amount of $23,281.75.

In the Verdict, I also find in favor of plaintiff Food Team International, LTD and against only defendant Unilink, LLC on plaintiff's claim for wrongful repudiation concerning yet-to-be-shipped broccoli and cauliflower, and enter judgment in favor

---

[1]    The reason I found against only defendant Unilink and not against individual defendants Gary Gregory, Marc Behaegel, and Akbar Boutarabi on plaintiff's non-PACA-trust claims for failure to pay invoices is because at trial plaintiff abandoned its non-PACA-trust claims against the three individual defendants to the extent plaintiff was asserting such claims.

-2-

of plaintiff Food Team and against defendant Unilink in the amount of $23,794.73.[2]

Finally, in the Verdict, I find in favor of plaintiff Food Team International, LTD and against defendant Unilink, LLC on the Second Counterclaim asserted by defendant Unilink against plaintiff Food Team for breach of contract in supplying defective produce, seeking incidental damages incurred by Unilink in storing the allegedly defective produce diverted by Unilink to a third party cold storage facility, for the reasons expressed below in the Discussion section under the subsection headed "Unilink's Remaining Counterclaim".

### JURISDICTION

This court has jurisdiction over the subject matter of plaintiff's federal claims pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e(c)(5), and 28 U.S.C. § 1331.  This court has supplemental jurisdiction over plaintiff's pendant state-law claims pursuant to 28 U.S.C. § 1367.

### VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to plain-

---

[2]     On plaintiff's PACA-trust claims for failure to pay concerning invoices 2901, 4115, and 1017, judgment was entered in favor of plaintiff Food Team International, LTD and against defendants Unilink, LLC, Gary Gregory, Marc Behaegel, and Akbar Boutarabi, by Order granting in part plaintiff's motion for summary judgment and accompanying Opinion dated May 17, 2013, and is not affected by this Adjudication.

tiff's claims occurred within this district and because a sub-stantial part of the property which is the subject of this action is located in this district.

Specifically, the perishable agricultural commodities which are at the center of the parties' dispute were delivered to defendant Unilink, LLC's facility in Rheems, Pennsylvania and were and/or are stored in a cold-storage facility in Lancaster, Pennsylvania.  Both Rheems and Lancaster are within Lancaster County, which is within this judicial district.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing its Complaint on July 21, 2010.[3]  On August 17, 2012 defendants filed an Answer to Complaint with Affirmative Defenses and Counterclaims ("Answer and Counterclaims").[4]  On September 15, 2012, pursuant to a court-approved stipulation expanding plaintiff's time to respond to defendants' counterclaims, plaintiff filed its Answer and Affirmative Defenses to Counterclaims.[5]

On February 18, 2011 I conducted a Rule 16 status conference by telephone with counsel for the parties.  After

---

[3]        Document 1. (Document numbers cited in this Adjudication refer to Docket Entries in the official docket Number 10-cv-03584-JKG in this matter.)

[4]        Document 4.

[5]        Document 12.

that status conference, I entered a Rule 16 Status Conference Order dated February 18, 2011 and filed February 24, 2011.[6]  At that conference and in that order, I attached this case for a non-jury trial during a two-week trial term commencing January 17, 2012, and set other appropriate pretrial deadlines.

My February 18, 2011 Order established August 31, 2011 as the deadline for either party to file dispositive motions, including motions for summary judgment, and set October 26, 2011 as the date for oral argument on any dispositive motion filed.

By Order dated August 24, 2011 and filed August 25, 2011,[7] I granted plaintiff's uncontested motion to extend discovery and accordingly modified in part my February 18, 2011 Rule 16 Status Conference Order.  Specifically, I extended the discovery deadline until October 17, 2011, established December 9, 2011 as the modified deadline for any dispositive motions, and re-scheduled oral argument on dispositive motions for February 3, 2012.  Finally, I re-attached this case for a non-jury trial during a two-week trial term commencing May 14, 2012.

---

[6]         Document 22.

[7]         Document 34.

## Partial Summary Judgment

Plaintiff's Motion for Summary Judgment was filed December 9, 2011[8] and refilled with eleven attachments on December 10, 2011.[9]  Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment was filed January 3, 2012.[10]  On February 3, 2012 Plaintiff's Reply to Defendants' Response to Motion for Summary Judgment[11] and Defendants' Surreply Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment[12] were filed.  Oral argument was conducted on Plaintiff's Motion for Summary Judgment on February 3, 2012.  At the conclusion of oral argument, I took the matter under advisement.

By Order and accompanying Opinion dated May 17, 2012 and filed May 18, 2012,[13] I granted in part and denied in part Plaintiff's Motion for Summary Judgment.  Specifically, for the reasons expressed in that Opinion, I granted plaintiff's motion to the extent that it sought summary judgment in its favor concerning the unpaid balance due for the produce billed on

---

[8]          Document 38.

[9]          Document 39.

[10]         Document 45.

[11]         Document 52.

[12]         Document 53.

[13]         Documents 69 and 68, respectively.

invoices 4115, 1017 and 2901, each of which contained a PACA-trust-preservation clause.[14]  I also granted plaintiff's motion to the extent that it sought contractual interest at the rate of 1.5% per month on the balances due on invoices 4115 and 1017. Furthermore, I granted plaintiff's motion to the extent that it sought a declaratory ruling that defendant Unilink accepted, and had a duty to pay for, invoices 1019, 4111, 1008, 1012, 1014 and 1015.[15]

Accordingly, I entered judgment in favor of plaintiff Food Team International, LTD and against defendants Unilink, LLC; Gary Gregory; Marc Behaegel; and Akbar Boutarabi on the PACA-trust claims in the sum of $104,843.37, as follows:

   (A) in the sum of $44,452.60 for the unpaid balance due for produce billed on invoices 4115 and 1017;

   (B) in the sum of $29,294.10 for contractual interest on the balances due on invoices 4115 and 1017;

   (C) in the sum of $26,115.70 for the unpaid balance due for produce billed on invoice 2901; and

---

[14] Throughout the non-jury trial of this case, all invoices were referred to by their last four digits and Unilink checks were referred to by their five-digit number.  See Transcript of Non-Jury Trial before The Honorable James Knoll Gardner[,] United States District Judge, May 18, 2012 (Document 77)("N.T. Day 1") at page 25.  For ease of reference, I will refer to the daily trial transcripts in the manner indicated in footnote 20, below.

[15] The total amount invoiced by Food Team to Unilink on those six invoices -- 1019 ($23,540.00), 4111 ($21,756.00), 1008 ($23,475.80), 1012 ($22,598.40), 1014 ($23,133.40), and 1015 ($23,133.40) -- is $137,637.00. See Plaintiff's Trial Exhibit 23 at pages 2, 4, 6-8, 10.

(D)   in the sum of $4,980.97 for statutory interest on
      the balance due on invoice 2901.[16]

Additionally, I granted plaintiff's motion and entered judgment in favor of plaintiff Food Team International, LTD and against defendant Unilink, LLC in the sum of $46,608.20 for the unpaid balance due on invoices 1008 and 1015.[17]

However, I denied plaintiff's motion to the extent that it sought summary judgment that plaintiff for attorney fees incurred in connection with its efforts to recover the unpaid balance on invoices 4115 and 1017.[18]

Accordingly, the balance of plaintiff's claims against defendants Unilink, LLC, Gary Gregory, Marc Behaegel, Akbar Boutarabi, Mike Moore, and Pennsylvania Food Group, LLC, and the counterclaims asserted by defendant Unilink against plaintiff

---

[16]      All three of these invoices -- 4115 (cauliflower florets), 1017 (broccoli florets), and 2901 (red pepper strips) -- contained a "PACA-trust-preservation" clause in a text box at the bottom of the invoice.  Two of the three invoices -- 4115 and 1017 -- also contained an interest rate provision if the for past-due charges.  See Plaintiff's Trial Exhibit 22 at pages 2-4.

[17]      Neither of these two invoices -- 1008 and 1015 -- contained a PACA-trust preservation language or a contractual interest provision for past-due charges.  See Plaintiff's Trial Exhibit 23 at pages 4, 8.

[18]      In addition to the PACA-trust preservation language and the interest rate provision, those two invoices -- 4115 and 1017 -- also contained a provision purportedly entitling plaintiff to attorney fees.  See Plaintiff's Trial Exhibit 22 at pages 2-4.

-8-

Food Team remained for disposition at the non-jury trial of this case.[19]

## **Non-Jury Trial**

A non-jury trial was held before the undersigned on May 18, 21-22, and 24, 2012.[20]

### Withdrawal of Claims Against Mike Moore and Pennsylvania Food Group, LLC

On the first day of trial, during its opening statement, plaintiff made an oral motion, through its lead trial counsel, Michael J. Keaton, Esquire, to withdraw all claims of plaintiff against defendants Mike Moore and Pennsylvania Food Group, LLC with prejudice.  I conducted a colloquy of plaintiff's representative, Dale A. Brunton, and determined that Mr. Brunton had authority to bind plaintiff to the decision to withdraw the claims and that plaintiff concurred in the oral motion made by its counsel.

Accordingly, and in the absence of objection from defendants, I entered an Order granting plaintiff's oral motion and dismissing all claims against defendants Mike Moore and

---

[19]        The two counterclaims are asserted by defendant Unilink only, and not by the individual defendants.  See Answer and Counterclaims at pages 7-10; N.T. Day 1 at pages 69-70, and 78-79.

[20]        A verbatim transcript of the notes of testimony of each day of the non-jury trial was produced and filed on the docket on June 6, 2012: Transcript of Non-Jury Trial held May 18, 2012 (Document 77)("N.T. Day 1"); Transcript of Non-Jury Trial held May 21, 2012 (Document 78) ("N.T. Day 2"); Transcript of Non-Jury Trial held May 22, 2012 (Document 79)("N.T. Day 3"); and Transcript of Non-Jury Trial held May 24, 2012 (Document 80)("N.T. Day 4").

Pennsylvania Food Group, LLC from plaintiff's Complaint with prejudice.[21]

<u>Stipulation to Entry of Judgment on First Counterclaim</u>

Defendant Unilink asserted two counterclaims against plaintiff Food Team.  The First Counterclaim and Second Counterclaim asserted by defendant Unilink are separate claims for different damages flowing from the same alleged breach of contract by Food Team.

Specifically, at trial, defendant Unilink sought, on its First Counterclaim, $3,916 for the cost of replacement broccoli to cover the broccoli which was diverted to third party cold storage and broccoli which was never shipped because defendant Unilink cancelled the broccoli contract before the completion of its term.  On its Second Counterclaim, Unilink sought $10,398.00 in freight charges, pallet costs, and storage costs related to the produce diverted to the third party cold storage facility.

On the first day of trial, again during its opening statement, plaintiff, through Attorney Keaton, agreed to the entry of judgment against it in the amount of $3,916.00 on the First Counterclaim asserted by defendant Unilink.  However, in agreeing to the entry of judgment against it in that amount on

_____
[21]     Order of the undersigned dated May 18, 2012 and filed May 22, 2013 (Document 71); <u>see</u> N.T. Day 1 at pages 17-23 (oral motion, colloquy, and order).

-10-

the First Counterclaim, plaintiff expressly provided that it did not concede or admit to having committed any breach of contract as alleged in the First Counterclaim asserted by defendant Unilink.[22]

Plaitiff Food Team did not similarly concede to entry of judgment in the amount sought by defendant Unilink on the Second Counterclaim, but rather put Unilink to its proof as to the alleged breach and damages asserted in the Second Counterclaim.

<u>Presentation of Evidence and Testimony</u>

Plaintiff did not call any witnesses during the non-jury trial, but did admit Plaintiff's Exhibits 1-30 into evidence.[23]  Following the admission of those exhibits, plaintiff rested its case-in-chief.[24]

Additionally, on the third day of trial a joint exhibit -- Plaintiff's Trial Exhibit 32 and Defendants' Exhibit 7 -- was admitted into evidence by stipulation of the parties.[25]

---

[22]     Order dated May 18, 2012 at page 2 n.1; <u>see</u> N.T. Day 1 at pages 71-73.

[23]     N.T. Day 1 at page 43; N.T. Day 2 at pages 8-9, 31, and 34.

[24]     N.T. Day 2 at pages 38-41.

[25]     N.T. Day 3 at page 85.  Defendants' objection was sustained to Plaintiff's Trial Exhibit 31, which was a partial copy of the complete document which was eventually admitted jointly as Plaintiff's Trial Exhibit 32 and Defendants' Exhibit 7.  <u>See</u> N.T. Day 3 at pages 77-84.

Four witnesses testified in defendants' case-in-chief:
Nurdin Hasagic (a former employee of Unilink)[26], defendant Gary
Gregory[27], defendant Marc Behaegel,[28] and Sue Haar (a former
employee of Unilink, who is now employed by defendant Gregory at
Frozen Food Development)[29].  Defendants admitted Defendants'
Exhibits 1-4[30] and 6-8 into evidence.[31]

Following the completion of defendants' case-in-chief
on the fourth day of trial, defendants' rested their case.
Closing arguments were held.  At the conclusion of those
arguments, I took the matter under advisement.

---

[26]      See N.T. Day 2 at pages 45-128.

[27]      See N.T. Day 2 at pages 128-200.

[28]      See N.T. Day 2 at pages 200-211.  Following defendant Behaegel's
testimony, plaintiff, through Attorney Keaton, made an oral motion to amend
the caption and docket in this matter to accurately reflect the spelling of
defendant Behaegel's (not, Behaegal) last name.  I granted that oral motion
in the absence of objection.  Order of the undersigned dated May 21, 2012 and
filed May 23, 2012 (Document 74); see N.T. Day 2 at pages 214-215.

[29]      N.T. Day 3 at pages 5-134.

[30]      Defendants' Exhibit 5 was marked, but was not offered or admitted
into evidence.  However, Defendants' Exhibit 5 is identical to Plaintiffs'
Exhibit 28, which was offered and admitted into evidence at trial.

[31]      N.T. Day 3 at pages 11-12, 15, 85, 138-141.

## Post-Trial Submissions

Following completion of trial and preparation of the transcript of the proceedings, the parties submitted proposed findings of fact and conclusions of law.[32]

## FINDINGS OF FACT

Based upon the testimony and exhibits received during the non-jury trial, and the pleadings and record papers in this matter, I make the following findings of fact.[33]

This action arises from a business dispute between plaintiff Food Team Intenational, LTD (a supplier of frozen produce) and defendant Unilink, LLC (a purchaser of wholesale quantities of frozen produce who, in turn, package and sell frozen produce to retail merchants).

Defendant Unilink is wholly owned by former-defendant Pennsylvania Food Group LLC, which is, in turn owned by defendant Gary Gregory, defendant Marc Behaegel, defendant Akbar Boutarabi, and former-defendant Mike Moore, as well as, three

---

[32]     On June 21, 2012, plaintiff filed Plaintiff's Proposed Findings of Fact and Conclusions of Law (Document 83)("Plaintiff's Proposed Findings and Conclusions"), and defendants filed Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law (Document 84)("Defendants' Proposed Findings and Conclusions"), together with Defendants' Post-Trial Memorandum of Law in Support of Its Proposed Findings of Fact and Conclusions of Law (Document 85)("Defendants' Post-Trial Memorandum").

[33]     The Findings of Fact reflect my credibility determinations regarding the testimony and evidence presented at trial.  Credibility determinations are within the sole province of the finder of fact, in this case the court. Fed.R.Civ.P. 52; See, e.g., Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739, 745 (1986).

other individuals.[34]  Although Unilink is wholly owned by
Pennsylvania Food Group, LLC, defendants Gregory, Behaegel, and
Boutarabi are each officers and members of defendant Unilink,
LLC.

In the fall of 2008, Food Team and Unilink entered
into agreements for sale of certain frozen vegetables (frozen
broccoli and cauliflower florets, and frozen red pepper strips)
by Food Team to Unilink.  Accordingly, Unilink submitted three
purchase orders ("P.O.") to Food Team for the produce in October
2008 (P.O. 6122 for broccoli, and P.O. 6123 for cauliflower) and
December 2008 (P.O. 6238 for red pepper strips)(hereafter
referred to as "broccoli contract", "cauliflower contract", and
"red pepper contract").

The produce was to be shipped from January 2009
through August 2009.  Specifically, the agreement between Food
Team and Unilink was for the shipment of one shipping container
of frozen broccoli per week beginning January 2009 and
continuing through June 2009;[35] one shipping container of frozen
cauliflower every three weeks beginning March 2009 and
continuing through August 2009;[36] and one shipping container of

---

[34]      See N.T. Day 4 at pages 47, 50 (testimony of defendant Gary
Gregory).

[35]      Plaintiff's Trial Exhibit 4, Unilink P.O. 6122 dated 10/29/08.

[36]      Plaintiff's Trial Exhibit 5, Unilink P.O. 6123 dated 10/29/08.

red pepper strips each month beginning April 2009 and continuing through July 2009.[37]

The agreed-upon amount of broccoli listed on P.O. 6122 was 999,990 pounds.  The agreed-upon amount of cauliflower listed on P.O. 6123 was 450,000 pounds.  However, the parties agreed to increase the quantity term for broccoli to 1,100,000 pounds and the quantity term for cauliflower was increased to 500,000 pounds, and to extend the shipments of broccoli through the first week of July 2009.[38]

The poundage of broccoli and cauliflower were increased to permit Food Team to maximize the capacity of each shipping container.[39]  The purchase order for red pepper strips -- P.O. 6238 -- was submitted after the adjustment was made to the broccoli and cauliflower orders and did not need to be amended to maximize shipping container capacity.[40]

The shipments of frozen produce from Food Team to Unilink commenced in January 2009 and, initially, the frozen produce was delivered, received, paid for, and utilized by

---

[37]        Plaintiff's Trial Exhibit 10, Unilink P.O. 6238 dated 12/05/08.

[38]        Plaintiff's Trial Exhibit 8, copy of confirmatory e-mail sent from Magdalena Swieton to Dale Brunton on November 15, 2008.

[39]        Defendant Gregory testified credibly that the change in the poundage was made to reconcile the poundage with the number of shipping containers that would be sent during the applicable shipping window at the applicable rate, and thereby to allow Food Team to maximize the capacity of each shipping container.  See N.T. Day 2 at pages 132-133.

[40]        See Plaintiff's Trial Exhibit 10, Unilink P.O. 6238.

-15-

Unilink without incident.  However, the business relationship between Food Team and Unilink began to erode in March 2009.

On March 10, 2009 the broccoli on invoice 1002 was delivered to Unilink.  That invoice was paid by Unilink check number 13170 dated April 17, 2009.[41]

On March 12, 2009, Magdalena Swieton (a procurement employee for Unilink)[42], sent an e-mail to Dale Brunton (the sales agent for Food Team who negotiated the produce contracts with defendant Gary Gregory) which stated:  "Hi Dale, Please review your pricing for broccoli florets -- PO 6122.  Price decrease would be appreciated.  Thank you."[43]

Neither Dale Brunton, nor any other Food Team employee or agent, agreed to a reduction in the contract price for broccoli florets requested by Unilink through Ms. Swieton at defendant Gregory's behest.

---

[41]        See Plaintiff's Trial Exhibit 11, copy of spreadsheet re. Accepted, Processed and Resold Loads; Defendants' Trial Exhibit 4, copy of spreadsheet prepared by Sue Haar, at page 1.

[42]        Plaintiff's Trial Exhibit 28, Transcript of Deposition of Magdalena Swieton taken October 26, 2011 ("Swieton Deposition"), at page 7.

[43]        Plaintiff's Trial Exhibit 12, copy of e-mail from Magdalena Swieton to Dale Brunton sent March 12, 2009.

On March 17, 2009 the broccoli on invoice 1004 was delivered to Unilink.  That invoice was paid by Unilink check number 13214 dated April 22, 2009.[44]

On March 25, 2009 the broccoli on invoice 1020 was delivered to Unilink.  That invoice was paid by Unilink check number 13409 dated May 13, 2009.[45]

On April 6, 2009 the broccoli on invoice 1009 was delivered to Unilink.  That invoice was paid by Unilink check number 13409 dated May 13, 2009.[46]

On April 7, 2009 the cauliflower on invoice 4106 was delivered to Unilink.  That invoice was paid by Unilink check number 13382 dated May 7, 2009.[47]

On April 16, 2009 Magdalene Swieton sent an e-mail to Dale Brunton which stated, "Dale, Please stop shipping broccoli florets until further notice.  Thank you[.]"[48]  Ms. Swieton's April 16, 2009 e-mail gave no reason for the hold requested on broccoli shipments, but she testified during her deposition that "[i]f there was a big drop in the demand from our [(Unilink's)]

---

[44]        See Plaintiff's Trial Exhibit 11, copy of spreadsheet re. Accepted, Processed and Resold Loads; Defendants' Exhibit 4, copy of spreadsheet prepared by Sue Haar, at page 1.

[45]        See footnote 44, supra.

[46]        See Id.

[47]        See Id.

[48]        Plaintiff's Trial Exhibit 13, copy of e-mail from Magdalena Swieton to Dale Brunton sent April 16, 2009.

-17-

customers, then we would stop the shipments" from Unilink's

suppliers.[49]

On April 17, 2009 Magdalena Swieton sent an e-mail to

Dale Brunton which stated:

> Dale,
>
> We found a lot of nails and other metal objects in
> products from China, including yours [(Food Team's)].
> I[n] addition we found cardboard pieces, worms in many
> cases with broccoli florets.  We are also rejecting a
> load for worms received on 4/14/09.
>
> **We had serious complaints from our customers.**
>
> This has to stop!
> Please send us your action plan how you want to avoid
> it.  Awaiting your reply.
>
> Thank you.[50]

On April 20, 2009 the broccoli on invoice 1013 was

delivered to Unilink.  That invoice was paid by Unilink check

number 13481 dated May 28, 2009.[51]

On May 1, 2009 Magdalena Swieton sent an e-mail to

Dale Brunton which stated:

> Dale,
>
> We received cauliflower on 4/28/09, PO 6123.

---

[49]     Plaintiff's Trial Exhibit 28, Swieton Deposition at page 19.

[50]     Plaintiff's Trial Exhibit 15, copy of copy of e-mail from
Magdalena Swieton to Dale Brunton sent April 17, 2009 (bold and underline in
original).

[51]     See Plaintiff's Trial Exhibit 11, copy of spreadsheet re.
Accepted, Processed and Resold Loads; Defendants' Exhibit 4, copy of
spreadsheet prepared by Sue Haar, at page 1.

Florets have freezer burn – up to 37% and minor blemishes – up to 19%.  Product was graded as B.  We can use it only for blends.

Please reply.
Thanks.[52]

On May 7, 2009 Unilink issued check number 13382 in the amount of $103,700 -- with $23,540.00 against invoice 1019 (broccoli); $28,122.00 against invoice 2302 (sugar snaps); $31,878.00 against invoice 3102 (water chestnuts); and $20,160.00 against invoice 4106 (cauliflower).[53]

On May 11, 2009 the broccoli on invoice 1016 was delivered to Unilink.  That invoice was paid by Unilink check number 13627 dated June 11, 2009.[54]

Also on May 11, 2009, the broccoli on invoice 1024-2 was delivered to Unilink.  That invoice was paid by Unilink check number 13698 dated June 19, 2009.[55]

On May 12, 2009 the cauliflower on invoice 4113 was delivered to Unilink.  That invoice was paid by Unilink check number 13627 dated June 19, 2009.[56]

---

[52]        Plaintiff's Trial Exhibit 16, copy of copy of e-mail from Magdalena Swieton to Dale Brunton sent May 1, 2009.

[53]        Defendants' Trial Exhibit 1, copy of Unilink checks with payment stubs and computer screen shots; Defendants' Trial Exhibit 4, copy of spreadsheet prepared by Sue Haar, at page 1.

[54]        See Plaintiff's Trial Exhibit 11, copy of spreadsheet re. Accepted, Processed and Resold Loads; Defendants' Trial Exhibit 4, copy of spreadsheet prepared by Sue Haar, at page 1.

[55]        See footnote 54, supra.

[56]        See id.

On May 13, 2009 the red pepper strips on invoice 2901 were delivered to Unilink.[57]  Invoice 2901 is the first of the invoices submitted to Unilink by Food Team that contains the PACA trust-preservation provision on it.[58]

On May 24, 2009, after an inspection conducted on May 14, 2009, which was commissioned by plaintiff Food Team, a report was issued by Trans-Port Marine Surveyors, Inc. ("Trans-Port Marine") concerning the cauliflower on invoice 4111 which defendant Unilink had diverted to the third-party cold storage facility operated by Kreider Foods Inc. in Lancaster, Pennsylvania.

Defendant Unilink used 1,872 pounds of the cauliflower invoiced on 4111 and diverted the remaining 49,928 pounds to the third-party cold storage because of alleged freezer burn and riceyness.[59]  The third-party inspection report produced by Trans-Port Marine based upon its inspection of the cauliflower on invoice 4111 which Unilink diverted to Kreider's cold storage facility concluded that there was no evidence that the shipment of cauliflower concerning invoice 4111 had sustained transit-

---

[57]        Plaintiff's Trial Exhibit 11, copy of spreadsheet re. Accepted, Processed and Resold Loads.

[58]        Plaintiff's Trial Exhibit 22 at page 2, copy of Food Team Invoice 2901 dated May 13, 2009.

[59]        See Defendants' Trial Exhibit 2G, Unilink Frozen Cauliflower Score Sheet re. Invoice 4111; Defendants' Trial Exhibit 4, copy of spreadsheet prepared by Sue Haar, at page 1.

related damages, or otherwise suffered from freezer burn or dehydration.[60]

On May 28, 2009 Unilink issued check number 13481 in the amount of $70,323.61 -- with $1,458.41 (partial payment)[61] against invoice 1008; $22,598.40 against invoice 1012; $23,133.40 against invoice 1013; and $23,133.40 against invoice 1014.

On June 3, 2009 Magdalena Swieton sent an e-mail to Dale Brunton which stated:

> Good morning,
>
> Please stop all shipments.
> Will notify you when [to] resume shipments. **It will probably be within 2-3 weeks.** If you have any questions, please do not hesitate to call me.
>
> Thank you.[62]

On June 5, 2009 the cauliflower on invoice 4115 was delivered to Unilink.[63]  Invoice 4115 is the first invoice submitted to Unilink by Food Team which contains both a PACA trust-preservation provision, as well as a provision for 18%

---

[60]     Plaintiff's Trial Exhibit 17, Report of Survey issued May 24, 2010 by Trans-Port Marine Surveyors, Inc., at page 4.

[61]     The total amount charged on invoice 1008 is $23,475.80.

[62]     Plaintiff's Trial Exhibit 18, copy of e-mail from Magdalena Swieton to Dale Brunton sent June 3, 2009 (emphasis added).

[63]     Plaintiff's Trial Exhibit 11, copy of spreadsheet re. Accepted, Processed and Resold Loads.

annual interest on past due accounts and a provision for attorney fees incurred in connection with past due invoices.[64]

On June 9, 2009, the broccoli on invoice 1017 was delivered to Unilink.[65]  Like invoice 4115, invoice 1017 contains both a PACA trust-preservation provision, as well as a provision for 18% annual interest on past due accounts and a provision for attorney fees incurred in connection with past due invoices.[66]

On June 19, 2009 Unilink issued check number 13698 in the amount of $44,749.10 -- with $22,778.40 against invoice 1024 (broccoli); $26,330.40 against invoice 2901 (red pepper strips with PACA trust language); $786.24[67] against invoice 4111 (cauliflower); and $21,756.00 against invoice 4113 (cauliflower).

The sum of the amounts purportedly paid by check number 13698 is $71,651.04, an amount which is $26,901.94 greater than the actual amount for which check number 13698 was issued.  The difference between face value of check 13698 and the value of the amount of payment it allegedly represents is based upon credits claimed unilaterally by Unilink for

---

[64]     Plaintiff's Trial Exhibit 22 at page 3, copy of Food Team Invoice 4115 dated June 5, 2009.

[65]     Plaintiff's Trial Exhibit 11, copy of spreadsheet re. Accepted, Processed and Resold Loads.

[66]     Plaintiff's Trial Exhibit 22 at page 3, copy of Food Team Invoice 4115 dated June 5, 2009.

[67]     The total amount on invoice 4111 is $21,756.00.

allegedly-worm-infested broccoli on invoice 1012 ($3,768.54 for broccoli diverted to Kreider's cold storage) and invoice 1014 ($23,133.40 for the same).

When the $44,749.10 actually paid by check number 13698 is applied in chronological order from earliest to latest against the invoices to which Unilink directed it, the following results: $786.24 is applied against invoice 4111 (leaving $43,962.86 of the $44,749.10), then $22,778.40 is applied against invoice 1024 (leaving $21,184.46 of the $44,749.10), and then that remaining $21,184.46 is applied against the $21,756.00 charged on invoice 4113.

After the funds actually conveyed by check 13698 are exhausted, a balance of $571.54 remains due on invoice 4113, and there are no funds remaining from check 13698 to apply toward payment of the $26,330.40 charged for the produce on invoice 2901 (red pepper strips) which is covered by the PACA trust-preservation on invoice 2901.

On June 23, 2009, at 7:42 p.m., Dale Brunton sent an e-mail to Magdalena Swieton conveying a message to defendant Gary Gregory:

> Dear Gary,
>
> We have discussed this at great lengths among ourselves as well as reviewed what our legal rights are when goods are rejected without substantiation.

So, I have to reiterate our position once again.

[Because] Unilink accepted the shipments, it can only claim damages against Food Team: (1) if it notified Food Team within a reasonable time of the alleged quality problems; and (2) it obtained an inspection by a neutral third party that proves the produce shipped by Food Team on these loads did not meet the contract grade A on arrival.  Since Unilink met neither of these two requirements to assert damages, it owes Food Team the total due on these below-mentioned shipments [(invoices 4111, 1015, 1014, 1012, 1008)] of $93,022.49.  Please pay this amount due no later than Friday, June 26th.

*   *   *

Regarding unfulfilled contracts for broccoli, red pepper, and cauliflower.  Please inform us of your intention as to resumption of shipment.  We expect your answer no later than tomorrow.

Best Regards,
Dale Brunton[68]

On June 23, 2009, at 9:10 p.m., Magdalena Swieton sent an e-mail to Dale Burnton, conveying a message from defendant Gary Gregory, which stated:

Dear Dale,

Please cancel the balance of our contracts. This action is taken as a result of numerous quality problems existing on your deliveries.  Please acknowledge receipt of this correspondence. Thank you!

Gary[69]

---

[68]       Plaintiff's Trial Exhibit 19 at page 3, copy of e-mail from Dale Brunton to Magdalena Swieton sent June 23, 2009 at 7:42 p.m.

[69]       Plaintiff's Trial Exhibit 19 at page 1, copy of e-mail from Magdalena Swieton to Dale Brunton sent June 23, 2009 at 9:10 p.m.

On June 27, 2009 Dale Brunton further responded to the June 23, 2009 cancellation e-mail as follows:

Dear Gary,

1. Regarding your cancellation of outstanding contracts, it represents a breach of contract, based on unsubstantiated claims.  We will hold Unilink LLC responsible for all damages.

2. Regarding cargo referred to in [Magdalena Swieton]'s e-mail of 6/19 as rejected.  The rejections are not in accordance with commercial law and are unsubstantiated.  However to protect our fiduciary interest we will take possession of these goods.  We will hold Unilink LLC responsible for any damages sustained no[t] limited to the re-sale of this product.

Best Regards,
Dale Brunton[70]

Unilink diverted to the Kreider's third-party cold storage facility some, or all, of the produce which arrived between March 25 and April 28, 2009 relating to six invoices: invoice 1019 (broccoli) delivered March 25, 2009;[71] invoice 1008 (broccoli) delivered April 13, 2009;[72] invoice 1012 (broccoli) delivered April 15, 2009;[73] invoice 1014 (broccoli) delivered

---

[70]        Plaintiff's Trial Exhibit 19, e-mail from Dale Brunton to Magdalena Swieton.

[71]        Defendants' Trial Exhibit 2C, Unilink Scoring Sheet dated March 25, 2009 re. invoice 1019.

[72]        Defendants' Trial Exhibit 2A, Unilink Scoring Sheet dated April 13, 2009 re. invoice 1008; Defendants' Trial Exhibit 2B, Scoring Sheet dated April 14, 2009 re. invoice 1008.

[73]        Defendants' Trial Exhibit 2D, Unilink Scoring Sheet dated April 15, 2009 re. invoice 1012.

April 21, 2009;[74] invoice 1015 (broccoli) delivered April 28, 2009;[75] and invoice 4111 (cauliflower) delivered April 28, 2009.[76]

It is unknown on precisely which date or dates each of these six loads was diverted to the third-party cold storage facility, but invoice 4111 (cauliflower) was diverted to Kreider's prior to May 14, 2009, and invoices 1019, 1008, 1012 1014, and 1015 (each broccoli) were diverted to Kreider's prior to July 13, 2009.

In July 2009, following Unilink's June 23, 2009 cancellation of the balance of the its contracts with Food Team, Food Team arranged for two additional third-party inspections of the Food Team produce which Unilink had diverted to Kreider's cold storage facility.

On July 13, 2009 an inspection was conducted for the produce on invoices 4111 (cauliflower), 1019 (broccoli), 1015 (broccoli), 1014 (broccoli), 1012 (broccoli), and 1008 (broccoli). An Inspection Report was generated for the produce by invoice. The report for invoice 4111 did not indicate the presence of any freezer burn. Moreover, the reports for each of the broccoli invoices for which an inspection was done -- 1019,

---

[74]     Defendants' Trial Exhibit 2E, Unilink Scoring Sheet dated April 21, 2009 re. invoice 1014.

[75]     Defendants' Trial Exhibit 2F, Unilink Scoring Sheet dated April 28, 2009 re. invoice 1015.

[76]     Defendants' Trial Exhibit 2G, Unilink Scoring Sheet dated April 28, 2009 re. invoice 4111.

1015, 1014, 1012, and 1008 -- indicate that each was checked for the presence of worms (which defense witnesses described to be visible to the naked eye) and that none were found.  Photographs of the broccoli samples taken during this inspection do not show any worms.[77]

During her deposition, Magdalena Swieton stated that photographs of the alleged worms were taken and that those photographs, and some worms themselves, were sent by Unilink through Federal Express to Food Team.[78]  However, at trial, defendants did not offer and admit into evidence any such photographs, actual worms, or documentation showing that such items were sent by Unilink to Food Team.

On July 15, 2009 an inspection of the produce from Food Team diverted to Kreider's cold storage facility by Unilink was conducted by the Agricultural Division of SGS North America Inc.  Each of the diverted shipments of Food Team broccoli sent by Unilink to Kreider's cold-storage facility were inspected and no worms were found or observed.[79]  Similarly, the Unilink cauliflower (invoice 4111) diverted to Kreider's cold storage

---

[77]    See Plaintiff's Trial Exhibit 20, Inspection Reports by Ms. Zhu dated July 13, 2009 and accompanying photographs.

[78]    Plaintiff's Trial Exhibit 28, Swieton Deposition at page 26.

[79]    Plaintiff's Trial Exhibit 21, Inspection Report of SGS North America Inc., Agricultural Division, dated July 21, 2009, at page 1.

was inspected and the report does not indicate the presence of freezer burn.[80]

All of Unilink's checks issued to Food Team cleared banking channels and Food Team did not refund any payments made by Unilink.

The broccoli delivered by plaintiff Food Team to defendant Unilink and subsequently diverted by Unilink to Kreider's cold-storage facility did not contain worms and was not otherwise compromised by the presence of nails or other foreign objects.  The cauliflower delivered by plaintiff Food Team to defendant Unilink and subsequently diverted by Unilink to Kreider's cold-storage facility was not compromised in quality by the presence of freezer burn, or otherwise.

Unilink did not divert the produce on invoices 2901, 4115, or 1017 to the third-party storage facility.  Unilink attempted to assert a credit toward payment on invoice 2901 in check number 13698.  Unilink did not issue a check to Food Team for payment against invoices 4115 or 1017, nor did Unilink assert a credit toward payment toward invoice 4115 or 1017 in any check issued to Food Team.

In August 2010, Seneca Food purchased all of Unilink's assets, including Unilink's inventory, machinery, and accounts receivable and payable.  More specifically, the actual produce

---

[80]        Plaintiff's Trial Exhibit 21, Inspection Report of SGS North America Inc., Agricultural Division, dated July 21, 2009, at page 2.

billed on the three PACA-protected invoices -- namely, invoice 2901 (red pepper strips), invoice 4115 (cauliflower), and invoice 1017 (broccoli) -- or the money received from the sale of that produce by Unilink to its customers, was among the assets sold to Seneca Foods for $1,400,000.00.

All proceeds from Unilink's sale of its assets to Seneca Foods were transferred to, and are still held by, former-defendant Pennsylvania Food Group LLC (Unilink's sole shareholder).

### CONCLUSIONS OF LAW

1.   Defendant Unilink breached its agreements with plaintiff Food Team by (A) failing to pay for the produce which was delivered to, and accepted by, defendant Unilink, and (B) repudiating the balance of the produce which remained to be shipped pursuant to the provisions of the broccoli and cauliflower contracts.

2.   Accordingly, defendant Unilink is liable to plaintiff Food Team for $23,281.95 for the delivered-and-accepted non-PACA-trust loads of produce.

3.   Plaintiff Food Team did not breach the broccoli contract or the cauliflower contract because plaintiff Food Team did not deliver to defendant Unilink broccoli infested with worms or contaminated by other foreign material or cauliflower damaged by freezer burn.

4.   Accordingly, plaintiff Food Team is not liable to defendant Unilink on the Second Counterclaim for breach of contract seeking recover of freight charges, pallet costs, and storage costs related to the produce diverted to the third party cold storage facility.

5.   Defendant wrongfully-repudiated the yet-to-be-shipped produce under the broccoli and cauliflower contracts.

6.   Plaintiff resold the wrongfully-repudiated broccoli and cauliflower to replacement buyers and defendant Unilink did not carry its burden to establish that plaintiff's mitigation resale was unreasonable.

7.   Accordingly, defendant Unilink is liable to plaintiff Food Team for $23,794.73 for the delivered-and-accepted non-PACA-trust loads of produce.

For the reasons expressed below, I find in favor of plaintiff Food Team and against defendants Unilink, Gary Gregory, Marc Beheagel, and Akbar Boutarabi on plaintiff's PACA-trust claims for failure to pay; and against defendant Unilink on plaintiff's non-PACA failure to pay claim and wrongful repudiation claim.  Moreover, I find in favor of plaintiff Food Team and against defendant Unilink on the Unilink counterclaim pursued at trial.  An accompanying Verdict dated September 30, 2013 is entered in accordance with this Adjudication.

-30-

## DISCUSSION

### Burden of Proof

A plaintiff asserting a breach of contract claim bears the burden of proof concerning the elements of its claim and must establish them by a preponderance of evidence.  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 102 (3d Cir. 2001)(applying Pennsylvania law); see 23 Williston on Contracts § 63:14 (4th ed. 2013).

Where a defendant alleges a breach of contract in a counterclaim, that defendant, as the party asserting the claim, bears the burden of proving the requisite elements at trial. Yellowbook Inc. v. Always in Service Inc., 2013 WL 4051263, at *9 (E.D.Pa. Aug. 12, 2013)(Robreno, J.)(citing Omicron Systems v. Weiner, 860 A.2d 554, 564 (Pa.Super.Ct. 2004)).

Once the elements of the breach of contract claim are established, a defendant has the burden of proof as to any affirmative defenses which it asserts.  See Prusky v. ReliaStar Life Insurance Company, 532 F.3d 252, 258 (3d Cir. 2008); see also 23 Williston on Contracts § 63:14 (4th ed. 2013).

Under Pennsylvania law, mitigation (or, rather, a claimant's failure to mitigate its damages) is an affirmative defense, for which the breaching party bears the burden of proof.  Prusky, 532 F.3d at 258.

To prove a failure to mitigate, the party asserting the defense must show: "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced."  Prusky, 532 F.3d at 258.

### Failure to Pay PACA Invoices

Plaintiff Food Team seeks to enforce payment to plaintiff Food Team from the PACA trust pursuant to 7 U.S.C. § 499e(c)(4).[81]

Here, three of the invoices for delivered produce which were submitted by plaintiff Food Team to defendant Unilink contain the requisite language to provide notice of, and trigger protection under, section 499e(C) of the PACA: namely, invoices 2901 (red pepper strips), invoice 4115 (cauliflower), and invoice 1017 (broccoli).

My May 17, 2012 Order, for the reasons expressed in the accompanying Opinion, granted plaintiff's motion for summary judgment with respect to invoices 2901, 4115, and 1017, the PACA-trust invoices, and entered judgment against defendant

---

[81]        Section 499e(c)(4) provides, in pertinent part, that where a plaintiff-seller includes sufficient PACA-trust-preservation language on its invoices (as with invoices 2901, 4115, and 1017 here), "[t]he seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received." 7 U.S.C. § 499e(c)(4) Section 499e(c)(5), in turn, provides that such a seller (the trust beneficiary) may bring an action to enforce payment of the invoice from the trust.  7 U.S.C. § 499e(c)(5).

Unilink, LLC, as well as individual defendants Gregory,
Behaegel, and Boutarabi.

On the first day of the non-jury trial, plaintiff
dismissed with prejudice all claims (including the PACA-trust
enforcement claim in Count I) against defendants Pennsylvania
Food Group, LLC and Mike Moore.  Therefore, plaintiff's claim in
Count I has been disposed of with respect to all defendants.
Nonetheless, I will address again the issue of individual
liability as to defendants Gregory, Behaegel, and Boutarabi in
light of the position taken in Defendants' Post-Trial Memorandum
that the basis for their individual liability has not been
sufficiently established.[82]

<u>Individual Liability Under the PACA</u>

While a plaintiff-seller pursues primary liability
against a PACA-licensed buyer-defendant (typically, as with
Unilink here, a business entity), a seller-plaintiff may seek to
recover payment on the balance of its PACA trust claims against
persons who may be found secondarily or individually liable to
the PACA trust beneficiary.  <u>Bear Mountain Orchards, Inc. v.
Mich-Kim, Inc.</u>, 623 F.3d 163, 167-168, 170-172 (3d Cir. 2010);
<u>Weis-Buy Services, Inc. v. Paglia</u>, 411 F.3d 415, 418-421
(3d Cir. 2005).

---

[82]      Defendants' Post-Trial Memorandum at pages 7-8.

"Individual liability in the PACA context is not derived from the statutory language, but from common law breach of trust principles." Weis-Buy, 411 F.3d at 421 (citing Sunkist Growers v. Fisher, 104 F.3d 280, 282 (9th Cir.1997)). "Under the common law, the trustee of a trust is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property." Id.

The Third Circuit explained in Weis-Buy that liability arising from this duty is distinct from the liability that arises when the corporate veil is pierced:

> An individual who is in the **position to control** the [PACA] trust assets **and** who **does not preserve them** for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act. This legal framework is to be distinguished from the piercing the veil doctrine, where the corporate form is disregarded because the individual has either committed a fraud, or because the corporation is a "shell" being used by the individual shareholders to advance their own purely personal rather than corporate ends.

Id. (quoting Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F.Supp. 346, 348 (S.D.N.Y. 1993))(emphasis added).

Although the mere failure to pay a PACA-protected invoice on time does not demonstrate a "dissipation or misuse of trust assets", ZAS International Agriculture, B.V. v. ZAS USA, Inc., 1998 WL 469958, at *2 (E.D.Pa. Aug. 7, 1998)(Waldman, J.), the regulations promulgated by the United States Department of

Agriculture ("USDA") pursuant to the PACA define "dissipation" as "any act or failure to act which *could* result in the *diversion of trust assets* or which could prejudice *or impair the ability of unpaid suppliers*, sellers, or agents *to recover money owed in connection with produce transactions*."  7 C.F.R. § 46.46(a)(2).

The USDA regulations further require PACA-trust assets to be maintained "in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities" and that "[a]ny act or omission which is inconsistent with this responsibility, *including dissipation* of trust assets, is unlawful and in violation of [7 U.S.C. § 499b]."  7 C.F.R. § 46.46(d)(1).

In August 2010, Seneca Food purchased all of Unilink's assets, including Unilink's inventory, machinery, and accounts receivable and payable.  More specifically, the actual produce billed on the three PACA-protected invoices -- namely, invoice 2901 (red pepper strips), invoice 4115 (cauliflower), and invoice 1017 (broccoli) -- or the money received from the sale of that produce by Unilink to its customers, was among the assets sold to Seneca Foods for $1,400,000.00.

The entirety of the proceeds from Unilink's sale of its assets to Seneca Foods were transferred to, and are still held by, former-defendant Pennsylvania Food Group LLC (Unilink's

-35-

sole shareholder).  In other words, Unilink sold all of its
assets (including PACA-protected assets) to Seneca Foods in
exchange for $1.4 million (now including PACA-protected assets)
and directed the $1.4 million (now including PACA-protected
assets) to another entity, namely Pennsylvania Food Group, LLC.
Moreover, defendants Gregory, Behaegel, and Boutarabi were
members of Unilink, LLC (which transferred $1.4 million,
including PACA-trust assets) and among the seven shareholders of
Pennsylvania Food Group, LLC (which received $1.4 million from
Unilink, including PACA-trust assets).

        Accordingly, to the extent that defendants seek,
through their post-trail memorandum, to have the court alter its
prior ruling on Plaintiff' Motion for Summary Judgment that
defendants Gregory, Beheagel, and Boutarabi are subject to
secondary, individual liability on plaintiff's PACA-trust
claims, that request is denied.

### Failure to Pay Non-PACA Invoices

        In my May 17, 2012 Order, and for the reasons
expressed in the accompanying Opinion, I granted Plaintiff's
Motion for Summary Judgment to the extent that it sought a
declaratory ruling that defendant Unilink accepted, and had a
duty to pay, six invoices which did not contain PACA trust-
preservation language: namely, invoices 4111 (cauliflower),
1019, 1008, 1012, 1014, and 1015 (each broccoli).  Moreover, by

my May 17, 2012 Order, I entered judgment in favor of plaintiff Food Team International, LTD and against defendant Unilink, LLC on invoices 1008 ($23,475.80) and 1015 ($23,133.40).

Defendant Unilink asserted payment of those invoices as an affirmative defense and pursued that defense at trial. Invoices 1012 ($22,598.40) and 1014 ($23,133.40) were paid in full by Unilink check number 13481, and invoice 1019 ($23,540.00) was paid in full by check number 13382.

Additionally, invoice 1008 was paid in part ($1,458.41)[83] by check number 13481, leaving an unpaid balance due on invoice 1008 of $22,017.39.  Invoice 1015 was not paid by Unilink, leaving an unpaid balance due on invoice 4111 of $23,133.40.  Invoice 4111 was paid in part ($786.24) by Unilink check number 13698, leaving an unpaid balance due on invoice 4111 of $20,969.76.

Accordingly, after applying the payments which defendant Unilink proved at trial, the remaining balance due on the six non-PACA loads which defendant Unilink accepted and for which it has a duty to pay is $66,120.55, which sum is comprised of $22,017.39 remaining on invoice 1008, $23,133.40 remaining on invoice 1015, and $20,969.76 remaining on invoice 4111.

However, defendant Unilink owes $44,837.82 to plaintiff Food Team for produce which was subsequently diverted

---

[83]         The total amount charged on invoice 1008 is $23,475.80.

to Kreider's cold-storage facility and then resold by plaintiff Food Team to replacement buyers for $42,838.60. Accordingly, defendant Unilink is entitled to an offset in the amount of $42,838.60 against the $66,120.55 due on outstanding invoices for the wrongfully-diverted produce. Therefore, the total amount due to plaintiff Food Team from defendant Unilink for outstanding invoices on wrongfully-diverted produce is reduced to $23,281.95.

### Wrongful Repudiation of Yet-to-be-Shipped Loads

Plaintiff Food Team claims that by directing it, on June 3, 2009, to stop shipments until further notice, and by cancelling, on June 23, 2009, all remaining shipments, defendant Unilink wrongfully repudiated the remaining broccoli and cauliflower which was to be shipped under the contracts.

Because Unilink cancelled the balance of the shipments under the broccoli and cauliflower contracts, and because I am not persuaded by the evidence and testimony adduced at trial that, in fact, the broccoli which Food Team shipped to Unilink actually contained worms and the cauliflower was damaged by freezer burn, I conclude that defendant Unilink cancelled the balance of those contracts without reasonable cause.

Based upon defendant Unilink's direction to stop shipments and its subsequent cancellation of all further shipments, defendant Unilink wrongfully repudiated 557,200 of

-38-

the 1,100,000 pounds of broccoli to be shipped under the broccoli contract (P.O. 6122) at the price of $0.535 per pound; and 297,640 of the 500,000 pounds of cauliflower to be shipped under the cauliflower contract at the price of $0.42 per pound. Accordingly, the contract value of the wrongfully-repudiated broccoli is $298,102.00, and the contract value of the wrongfully-repudiated cauliflower is $125,008.80.

### Resale of the Wrongfully-Repudiated Loads

The contract value of the wrongfully-repudiated (and, thus, not shipped to Unilink) broccoli was $298,102.00, and that broccoli was sold and shipped to other buyers for a total price of $284,868.03, for a loss on the mitigation resale of the repudiated broccoli of $13,233.97.[84]

The contract value of the wrongfully-repudiated cauliflower was $125,008.80, and that cauliflower sold and shipped to other buyers for a total price of $114.448.04, for a loss on the mitigation resale of $10,560.76.

Plaintiff, through Attorney Keaton, withdrew its claim for expenses incurred in the mitigation resale of the diverted and wrongfully-repudiated produce.[85]

Defendants are correct that plaintiff Food Team had an affirmative duty to mitigate its damages,[86] plaintiff satisfied

---

[84]        See Plaintiff's Trial Exhibit 24.

[85]        N.T. Day 1 at page 43.

Case 5:10-cv-03584-JKG   Document 87   Filed 09/30/13   Page 40 of 42

that duty by obtaining buyers for all wrongfully diverted and wrongfully repudiated broccoli and cauliflower.

To prove a failure to mitigate, the party asserting the defense must show: "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced."  <u>Prusky</u>, 532 F.3d at 258.

I conclude that defendants have not carried their burden of proof on the failure-to-mitigate defense.  Plaintiff Team resold all of the diverted and wrongfully-repudiated -- some at prices above, and some at prices below, the prices negotiated the between Food Team and Unilink the previous year. Accordingly, plaintiff Food Team has sustained its claim for wrongful repudiation of the unshipped balance of produce under the broccoli and cauliflower contracts and has demonstrated damages in the amount of $23,794.73, comprised of $13,233.97 on wrongfully-repudiated broccoli and $10,560.76 on wrongfully-repudiated cauliflower.

## Unilink's Remaining Counterclaim

As noted in the Non-Jury Trial subsection of the above Procedural History, plaintiff Food Team agreed to the entry of judgment against it in the amount of $3,916.00 on the First Counterclaim asserted by defendant Unilink without conceding or

---

[86]  Defendants' Proposed Findings and Conclusions at ¶ A.

-40-

admitting to having committed any breach of contract as alleged by defendant Unilink.

Defendant Unilink pursued its Second Counterclaim against plaintiff Food Team seeking $10,398.00 incidental damages incurred by Unilink in storing the produce from the six invoices which were diverted by Unilink to the third-party cold storage facility after they were unloaded and accepted at Unilink's facility.

As the party asserting the counterclaim, defendant Unilink had the burden at trial of proving a breach entitling it to those incidental damages.  Here, that required defendant Unilink to prove by a preponderance of evidence that the broccoli delivered by Food Team and later diverted by Unilink was contaminated by the presence of worms, and that the cauliflower delivered by Food Team and later diverted by Unilink suffered from freezer burn.  Based upon the evidence submitted at trial, I conclude that defendant Unilink did not carry that burden.  Accordingly, I enter judgment in favor of plaintiff Food Team and against defendant Unilink, LLC on the Second Counterclaim.

## CONCLUSION

For all the forgoing reasons, I enter the accompanying Verdict in favor of plaintiff Food Team International, LTD, and

against defendant Unilink, LLC, in the amount of $23,281.75 on plaintiff's non-PACA-trust claims for failure to pay invoices.

I also find in favor of plaintiff and against defendant Unilink in the amount of $23,794.73 on plaintiff's non-PACA-trust claim for wrongful repudiation concerning yet-to-be-shipped broccoli and cauliflower.

On plaintiff's non-PACA-trust claims for failure to pay, I find in favor of individual defendants Gary Gregory, Marc Beheagel, and Akbar Boutarabi, and against plaintiff Food Team.

Finally, on the Second Counterclaim asserted by defendant Unilink, LLC, for breach of contract in supplying defective produce, I find in favor of plaintiff and against defendant Unilink.